GREGORY DAMONNE BROWN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brown v. Commissioner
Docket No. 17512-87
United States Tax Court
T.C. Memo 1989-541; 1989 Tax Ct. Memo LEXIS 541; 58 T.C.M. (CCH) 310; T.C.M. (RIA) 89541; September 28, 1989
Edward B. Simpson and John Gigounas, for the petitioner. Charlotte Mitchell and Thomas G. Schleier, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In a deficiency notice mailed to petitioner on April 7, 1987, respondent determined deficiencies in and additions to petitioner's income tax for the years and in amounts as follows: Additions to tax
Year
Deficiency
Section 6653(b)(1) *
Section 6661 [1]
1982
$  5,037.70
$ 2,518.85
$ 1,259.42
1983
11,585.20
5,792.60
2,896.30
1984
13,986.86
6,993.43
3,496.72
*542 At trial respondent conceded that petitioner is entitled to an additional deduction in the amount of $ 1,400 for education expenses in 1983, and petitioner conceded that he had unreported interest income for the same year in the amount of $ 213. After these concessions the issues remaining for decision are: (1) whether petitioner had unreported income of $ 16,231.80 in 1982, $ 27,489.31 in 1983, and $ 37,640.69 in 1984; (2) whether part of the deficiency for any year is due to fraud; (3) whether an assessment for 1982 is barred by the statute of limitations; and (4) whether there is a substantial understatement of income tax for each year within the meaning of section 6661. For convenience and clarity our findings of fact and opinion are combined. Some of the facts have been stipulated and are so found, the parties' stipulations and related exhibits being incorporated herein by reference. Petitioner was a resident of Fremont, California, at the time of filing his petition. He filed a timely income tax return for each of the years 1982, 1983, and 1984. Petitioner was born in 1955 in Berkeley, California, to Sylvia Brown and her then husband, Tommy Lee Brown. His natural *543 parents had moved in 1953 from Kansas to California where his mother was employed by a telephone company and Mr. Brown worked in the oil fields. Before petitioner was born his father left his mother in California and purportedly went to Utah in search of work. For some time petitioner's mother was unable to find any trace of Mr. Brown, but about the time petitioner was born she was informed by her father in a long distance telephone call that Mr. Brown had been convicted of armed robbery and was incarcerated in Missouri for a period of seven to ten years. When petitioner was about five years old, his mother remarried Don Farr. In or about 1964 or 1965 she and Mr. Farr were divorced and she and petitioner moved to Russell, Kansas, her hometown, where she operated a flower shop and in 1966 or 1967 became the wife of Victor Roth. Petitioner lived with his mother and Mr. Roth until he graduated from high school in 1973. Prior to and for several years after returning to Russell, petitioner's mother had no contact with Mr. Brown. In 1971 or 1972 she learned from her brother that Mr. Brown was living in Liberal, Kansas, which was about 150 miles from Russell. In 1972, when petitioner *544 was 17 years old and a junior in high school, his mother had her brother contact Mr. Brown with a view to arranging a meeting by petitioner with him. A few days later Mr. Brown walked into her flower shop unannounced and after some conversation requested that she permit petitioner to live with him in Liberal and finish his schooling there. During this conversation petitioner also entered the flower shop and met his father for the first time. During this first meeting Mr. Brown gave petitioner a Lord Elgin watch and suggested that petitioner visit him and his family in Liberal. Tommy Lee Brown had been released from prison after serving about four years and had gone to work in the oil fields in Kansas. In August of 1959 he had remarried and by his second wife, Mary B. Brown had three children. At the time she married Mr. Brown, Mary B. Brown was aware that he had been in prison, that he had been married before, and that he had a son by the previous marriage which he had never seen. Prior to meeting with petitioner in 1972, Mr. Brown told his wife that he was going to Russell to see petitioner. From their first meeting in 1972 until after his graduation from high school in *545 1973, petitioner visited in Liberal with his father and his father's second family on one or two weekends out of every month. At first these visits were strained but generally they were cordial apparently because there was no strong feeling of hostility by either petitioner, his stepmother, or her children. When petitioner graduated from high school in 1973 his father gave him $ 400 in cash. Neither petitioner's mother nor his stepmother were present when his father gave him the watch or the $ 400 but they both knew about these gifts. In fact Mr. Brown told the stepmother about these gifts before they were made. After graduating from high school, petitioner moved to Liberal and lived with Mr. and Mrs. Brown and their children for a few months. He then moved into a garage apartment in Liberal which he rented for $ 50 per month. Petitioner continued to live in Liberal during the balance of 1973 and part of 1974 during which he worked at Tradewind Industries for a net monthly salary of about $ 480. In 1973 petitioner bought a 1967 Cadillac for $ 600 which he financed through a bank. He later sold this car to Mr. Roth and financed the purchase of a 1969 Oldsmobile for $ 900. Mr. *546 and Mrs. Roth paid for the insurance on both of these cars. At trial petitioner estimated that his expenses during this period were nominal, and he was able to save about $ 300 per month. In 1974 petitioner moved to Denver where he lived with Mr. and Mrs. Roth while working at Arby's Restaurant for six months at about $ 200 per month, and four months at Windsor Gardens where he earned a net salary of about $ 580 per month. During 1975 and 1976 petitioner continued to live with the Roths and to work as a junior buyer at Windsor Gardens where he earned a net monthly salary of about $ 580 in 1975 and $ 660 for ten months in 1976. During this period he was able to save most of his earnings since he was living with the Roths and had no expenditures for rent or food. In the latter part of 1976 petitioner left Mr. and Mrs. Roth in Denver and moved to Colorado Springs where for the last three months of 1976 and the first eight months of 1977 he worked as a waiter at the Broadmoor Hotel netting about $ 1,600 per month. For four months in 1978 and ten months in 1979 petitioner worked as an orderly at Penrose Hospital in Colorado Springs at a net monthly salary of $ 590 in 1978 and $ *547 600 in 1979. In Colorado Springs he shared an apartment with a roommate at $ 100 per month. While working at Arby's in Denver and at the Broadmoor in Colorado Springs, petitioner was provided meals and uniforms by his employers. As a result, during these periods his living expenses were nominal. In 1979 petitioner moved to Oakland, California, where he worked for six months as a security guard for a net salary of $ 750 per month. In 1980 petitioner worked for seven months as a reservations agent for World Airways at a salary of $ 750 per month. During 1980 he also worked full time as a waiter in a Jack-in-the-Box Restaurant. At some date in 1980 petitioner's mother joined him in California and lived in his apartment during 1981, 1982, 1983, and 1984. During this period she received some support from Mr. Roth but petitioner claimed her as a dependant in 1983 and 1984 because he furnished more than 50 percent of her support. During these years 1981 through 1984 he managed to hold his living expenses to about $ 450 per month. During 1981, 1982, and through March 1983, petitioner was employed as a travel agent at the Bob Page Travel Agency where he earned a net income of $ *548 600 to $ 650 and had estimated living expenses of $ 450 to $ 500 per month. From 1981 through 1984 petitioner was also employed full time at Mountain Mike's Pizza Parlor where he earned $ 4,000 to $ 6,000 each year. From March of 1983 through the end of 1984 petitioner was employed as a travel agent at the Fremont World Travel Agency where he received a net salary of $ 7,253.38 in 1983 and $ 12,684 in 1984. On his income tax returns for 1982, 1983, and 1984 petitioner reported gross incomes as follows: Gross Income Reported
Source
1982
1983
1984
Wages
Bob Page Travel
$ 10,118.62
$  2,572.39
Fremont World Travel
7,253.38
$ 12,684.00
Mtn. Mike's Pizza
6,034.90
5,108.00
5,435.00
Interest
Wells Fargo, et al.
636.00
865.00
754.00
State Tax Refunds
California
180.00
214.00
157.00
Totals (Rounded)
$ 16,970.00
$ 16,012.00
$ 19,030.00
About the end of 1981 petitioner opened both a savings account and a checking account at Wells Fargo Bank in Fremont. Petitioner had no bank accounts prior to this date with the exception of a small savings account which he had opened and closed in 1973 in Liberal. His initial deposits *549 in 1981 to the savings account at Wells Fargo totaled about $ 8,000 or $ 9,000. His average balance in this account during 1982, 1983, and 1984 was about $ 8,000. During 1982, 1983, and 1984 petitioner made deposits to his checking account at Wells Fargo Bank in the total respective amounts of $ 29,867.80, $ 40,988.04, and $ 53,876.38. By comparing the deposits made by petitioner to the checking account during 1982 with the gross income reported by petitioner on his return for that year, respondent determined that petitioner had unreported income in 1982 in the amount of $ 16,231.80 computed as follows: Total deposits to checking account
$ 29,867.80 Less
Wages reported net of withholdings
$ 12,820.00
Interest reported
636.00
Tax refund reported
180.00
(13,636.00)
Unreported income
$ 16,231.80 By comparing the deposits made by petitioner to his checking account during 1983 with the gross income reported by petitioner on his return for that year, respondent determined that petitioner had unreported income in 1983 in the amount of $ 27,489.31 computed as follows: Total deposits to checking account
$ 40,988.04 Less
Wages reported net of withholdings
$ 12,419.73
Interest reported
865.00
Tax refund reported
214.00
(13,498.73)
Unreported income
* $ 27,489.31 *550 By comparing the deposits made by petitioner to his checking account in 1984 with the amount of income reported on his return for that year, respondent determined that petitioner had unreported income in 1984 in the amount of $ 37,640.69 computed as follows: Total deposits to checking account
$ 53,876.38 Less
Wages reported net of withholdings
$ 15,324.69
Interest reported
754.00
Tax refund reported
157.00
(16,235.69)
Unreported income
$ 37,640.69 At trial petitioner testified that the source of the $ 8,000 or $ 9,000 used in 1981 to open his savings account and the source of the excess of deposits made to his checking account during 1982, 1983, and 1984 over his reported earnings for such years was a cash hoard which he had accumulated prior to 1982. According to petitioner $ 45,000 of the cash hoard was given to him on four different occasions by his father and the balance of about $ 47,000 was accumulated by petitioner from his earnings during 1973 through 1981. With respect *551 to the gifts from his father, petitioner stated that after he graduated from high school in May of 1973 he lived for two or three months with his father and stepmother in Liberal. He then moved out of their house and into a garage apartment where he lived until July of 1974 but visited his father or his father's second family once or twice a week. Shortly before he left Liberal in July of 1974 and moved to Denver to live with his mother and Mr. Roth, petitioner testified his father came to his garage apartment for a visit and they had a conversation about his pending move to Colorado and his future plans with respect to schooling. During the conversation petitioner stated his father gave him an envelope and said something like "this is to help you with education when you * * * decide to do it." After his father left petitioner said he opened the envelope and was surprised to find it contained $ 5,000. Petitioner further testified that in September of 1974 he returned to Liberal from Denver in order to get some items which he had left in storage and, while visiting alone with his father, was given a second envelope containing $ 10,000 in cash including some $ 100 bills. During *552 this visit petitioner stated that his father told him the gift "was because of all the lost years of not raising me, for support, that he did not pay for me for all those years." Petitioner also testified that in 1976 while he was living with his mother and Mr. Roth in Denver his father came to Denver on a business trip and visited with him. They met at a restaurant, had dinner, and discussed the fact that petitioner was not yet in college. In the car after dinner his father gave him a third envelope containing $ 15,000. Again, according to petitioner, his father, his stepbrother, and a friend of his stepbrother visited him in 1977 while he was living in Colorado Springs in an apartment which he shared with a roommate. They all visited together for a time but eventually his father indicated he wanted to have a private conversation and he and petitioner went into the bedroom of the the apartment where, after asking about petitioner's mother, the father again stated that it was important for petitioner to go to college and that he was giving him another $ 15,000 because petitioner was not going to be mentioned in his father's will. At this time his father gave him a fourth envelope *553 containing another $ 15,000. On January 29, 1983, petitioner received a telephone call from his father's brother in which petitioner was informed that his father had been killed in an accident. Petitioner was never contacted about his father's estate and never received any part of the estate or the proceeds of at least four insurance policies on his father's life. Petitioner stated that on the occasion that he received the first gift of money from his father, his father said that it was not necessary "to mention the money to anyone; my mother or to the Brown family, as he made that a gift to me and did not want them to know of this gift, that it would cause hardships between the families." Petitioner further stated that similar statements were made by his father on each of the other three occasions that he received gifts of money from his father and it was for this reason that he never told anyone about the gifts. He did tell his mother that his father had given him some money but she was not aware of any amount other than the $ 400 given to petitioner upon his graduation from high school. Petitioner said that upon receipt of the first of the disputed gifts from his father -- *554 the $ 5,000 in July of 1974 -- he placed those funds in "a little box with flaps" which he first kept in his closet. He further testified that he later placed these funds, as well as the subsequent gifts from his father, and his accumulated earnings in a Tupperware bread box inside a U-Haul box which he kept hidden in his closets in Denver, Colorado Springs, and later in California. While moving, he kept these boxes in the locked trunk of his car. He stated that until about 1981 he never considered the possibility of depositing the funds in a bank account because such action might have disclosed the existence of the funds to his mother or to other parties which would have been contrary to his father's instructions. Petitioner also stated that he did not trust banks because of Mr. Roth's distrust of such institutions as revealed by Mr. Roth's frequent stories concerning bank failures. In the fall of 1981 he opened a savings account at the Wells Fargo Bank and in different deposits placed a total of about $ 8,000 or $ 9,000 in that account. During 1982 through 1984 the average balance in the savings account was about $ 8,000. Petitioner was unable to produce at trial any record *555 of that portion of his cash hoard which was allegedly accumulated from his own earnings during 1973 through 1981. His explanation for the lack of such records was that he made no simultaneous written record of the accumulations and of course there were no third party records such as those that would have been generated by a bank account. However, he estimated at trial that his accumulation of cash from earnings during the years 1973 through 1981 proceeded somewhat as follows: Accumulated
1973
Earnings
Net earnings - Tradewinds
(12 mos. at $ 480)
$ 5,760
Less expenses (12 mos. at $ 180)
2,160
Savings
$ 3,600
1974
Net earnings - Arby's
(6 mos. at $ 200)
1,200
Less expenses (6 mos. at $ 50)
300
900
Net earnings - Windsor Gardens
(4 mos. at $ 580)
2,320
Less expenses (4 mos. at $ 55)
220
2,100
1975
Net earnings - Windsor Gardens
(12 mos. at $ 580)
6,960
Less expenses (12 mos. at $ 50)
600
6,360
1976
Net earnings - Windsor Gardens
(10 mos. at $ 660)
6,600
Less expenses (10 mos. at $ 60)
600
6,000
Net earnings - Broadmoor Hotel
(3 mos. @ $ 1,600)
4,800
Less expenses (3 mos. at $ 150)
450
4,350
1977
Net earnings - Broadmoor Hotel
(8 mos. at $ 1,600)
12,800
Less expenses (8 mos. at $ 200)
1,600
11,200
1978
Net earnings - Penrose Hospital
(4 mos. at $ 590)
2,360
Less expenses (4 mos. at $ 200)
800
1,560
1979
Net earnings - Penrose Hospital
(10 mos. at $ 600)
6,000
Less expenses (10 mos. at $ 200)
2,000
4,000
Net earnings - APS
(2 mos. at $ 750)
1,500
Less expenses (2 mos. at $ 250)
500
1,000
1980
Net earnings - APS
(4 mos. at $ 750)
3,000
Less expenses (4 mos. at $ 250)
1,000
2,000
Net earnings - World Airways
(7 mos. at $ 750)
5,250
Less expenses (7 mos. at $ 450)
3,150
2,100
Net earnings - Bob Page Travel
(3 mos. at $ 650)
1,950
Less expenses (3 mos. at $ 450)
1,350
600
1981
Net earnings - Bob Page Travel
(12 mos. at $ 650)
7,800
Less expenses (12 mos. at $ 540 +/-)
6,500
1,300
Total (Estimated Accumulations
from Earnings)
* $ 47,070
*556 Petitioner testified that the accumulations from his earnings during 1973 through 1981 were kept in the Tupperware bread box with the funds he had received from his father. He also testified that such accumulations were possible because during most of this period his personal expenses were nominal. For instance, in Liberal during 1973 and 1974 he was living in a garage apartment on which the rent was only $ 50 per month, his mother and Mr. Roth were making the insurance payments on his cars, he did not date, and spent very little money on entertainment which was limited to an occasional movie. After he moved to Denver in 1974, he lived rent and food free with his mother and Mr. Roth during the balance of 1974 and all of 1975 and nine months of 1976. After moving to Colorado Springs in 1976, he shared an apartment at $ 100 per month with a roommate and received a uniform and free meals from the Broadmoor where *557 he was employed as a waiter until April or May of 1978. For the other eight months in 1978 and for ten months in 1979 he worked as an orderly at Penrose Hospital where he again was provided by his employer with uniforms and meals. [2]
In August of 1980 petitioner left World Airways and went to work as a travel agent for Bob Page Travel Agency. He testified that in this job he soon realized he had found a profession that he really liked, and that his boss encouraged him to travel and to dress better by wearing suits and ties and to drive a newer car in order to better represent the company in his dealings with the public. Petitioner also testified that during this same period he began to overcome his mistrust or fear of banks and with encouragement from his mother and others he decided in the latter part of 1981 to open the savings and the checking accounts at Wells Fargo Bank. Even though the balance in the savings account apparently remained at or about *558 $ 8,000 during the next three years, petitioner testified that he had to make substantial deposits to his checking account during these years in excess of his current earnings in order to cover the checks he was writing for his additional expenses. He said that the deposits in excess of his current earnings were made from funds in the Tupperware bread box. To counter petitioner's claim that he received $ 45,000 in gifts from his father, respondent relies almost entirely upon the testimony of petitioner's stepmother, Mary B. Brown. She testified that for a short time after she and Tommy Lee Brown were married in 1959 they lived in an apartment in Liberal where she was employed by a bank and he worked in the oil fields. About July of 1960 she quit her job to have the first of their three children and she was not employed again until after her husband's death in 1983. Mrs. Brown also stated that in 1960 they bought their first house for $ 11,000 and financed its purchase through a local bank. In 1972 they sold the $ 11,000 house for $ 48,000 which they deposited in a bank, and moved with their children to Canada where they lived for a short time. Upon returning to Liberal they *559 bought another house for $ 53,500 using the $ 48,000 received upon the sale of the first house plus $ 5,500 in cash. They were still living in the second house when Mr. Brown died in 1983. Mrs. Brown testified that during the 1960's Mr. Brown had several different jobs in the oil fields. About 1970 he went to work for Pengo Industries at an annual salary of about $ 18,000. At his death he was still employed by Pengo where for several years he had been area sales manager at an annual salary of about $ 40,000 plus a percentage of his sales. The percentage amounted to about $ 800 to $ 1,000 per month. In connection with his employment Mr. Brown traveled away from home some part of every month. A trip of one or two weeks was not unusual and occasionally he would be away from home for as long as a month. His business travels included trips not only to places within Kansas but also to Texas, Oklahoma, Colorado, Utah, Wyoming, Michigan, and Illinois. To cover his travel expenses he did not receive travel advances from Pengo. Instead he paid his own travel expenses and was reimbursed by Pengo with separate checks which were cashed by him or, if he was busy, by Mrs. Brown. As a *560 general rule he gave his payroll checks to Mrs. Brown who deposited them in their joint checking account. She was responsible for paying their household and other everyday expenses with checks drawn on the joint account. Consequently, she was aware of and responsible for almost all of the checks drawn on and the deposits made to their checking account. Mrs. Brown also testified that for the years immediately preceding his death she knew of no source of funds for Tommy Lee Brown except through his employment with Pengo. She considered their style of living during the 1970's to be neither poor nor wealthy but modest. In 1970 they financed the purchase of an Oldsmobile and drove it for ten years. In 1978 they bought a second car, a Datsun, and paid for it with cash in the amount of $ 4,000. At some point during the 1970's Mr. Brown bought one of their daughters a car by assuming the payments on a Volkswagen which one of his fellow employees could not make. When Mrs. Brown was first told by respondent's agent of the alleged gifts by Mr. Brown to petitioner, she doubted Mr. Brown's ability to make such gifts, but she later noticed that in one year during the 1970's they had sent *561 their son who was then in college about $ 10,000. She concluded, therefore, that she could not say the alleged gifts to petitioner were impossible. She could only say that she had no knowledge of such gifts and no knowledge of how they could have been made by Mr. Brown. Mrs. Brown also recalled that at some point during the 1970's Mr. Brown inherited $ 10,000 from "a lady who raised him." Mrs. Brown deposited these funds in their joint account. To her knowledge Mr. Brown never owned any stock or other investments except a few shares in Pengo which he sold for about $ 2,000. In support of his claim that the disputed deposits made to his checking account during 1982, 1983, and 1984 were made to cover checks already written or to be written in a short period of time after each deposit, petitioner relied upon the testimony of Joe Sugawara. Mr. Sugawara is a certified public accountant. He has a bachelor's degree in business administration with a major in accounting from the University of Cincinnati. He was employed for a number of years by respondent in various positions including revenue agent, special agent, appellate auditor, appellate conferee, and for ten years was the chief *562 of the audit section of an appellate division. While employed by respondent he analyzed numerous bank accounts. Mr. Sugawara, at the request of petitioner's counsel, analyzed the monthly statements and the checks associated with petitioner's checking account at Wells Fargo Bank for the years 1982, 1983, and 1984 to see if there was any correlation or tie-in between the checks written and the various deposits made to the account. During his analysis he prepared a schedule for each year reflecting the date and amount of the checks written on the account during the years, the date and amount of the deposits made to the account during the years, and the balance in the account after each deposit was made. From his analysis he found that the average balance in the account during 1982, 1983, and 1984 was relatively stable. It varied less than $ 1,000 during the entire period. From the analysis he concluded that the disputed deposits appeared to have been made in order to keep the bank balance from being depleted. In other words, the deposits were made to cover checks that were already written or to be written within a short period. He reached the same conclusion in 1982 where he *563 used only total deposits as he reached in 1983 and 1984 where he used only cash deposits. The general tenor of Mr. Sugawara's testimony was to the effect that, in his varied experience as an employee of respondent, he had seldom seen such a correlation between deposits made and checks written where the source of the deposits was unreported taxable income. Nina Joy Diffenbach testified with respect to petitioner's work habits and general character during the years in dispute. From August of 1981 through December of 1984 she and her husband owned and operated Mountain Mike's Pizza Parlor. During this entire period petitioner worked at the travel agency during the day and worked for her and her husband at night and on weekends. Petitioner's duties included handling the cash register, dealing with customers out front, and closing the business on some nights. During this period petitioner had the combination to the safe and was responsible for making night deposits for the business. When asked if she had an opinion of petitioner's character Mrs. Diffenbach replied: "Oh, absolutely. I'd trust him with anything I have. He was a very good employee, always on time, always came to work, *564 never left us without anyone to work the front, which is a bad situation because so many of them don't show. Greg was always there on time, always neat and clean, always very honest as far as we were concerned. He was a very valued employee." In this case the basic issue is whether the source of the deposits made to petitioner's checking account during 1982, 1983, and 1984 in excess of his reported earnings was taxable income or a cash hoard accumulated by petitioner prior to 1982. It is petitioner's contention that the disputed deposits do not constitute taxable income because the deposits were made in part with funds totaling $ 45,000 which were given to him by his father on four different occasions, two in 1974, one in 1976, and one in 1977, and in part with funds totaling about $ 47,000 which petitioner accumulated from earnings during 1974 through 1981. Even though he was unable to ascertain their source, respondent determined that the excess deposits constituted taxable income. He is satisfied with contending that under the circumstances petitioner's testimony as to the source of the funds is inherently incredible and unworthy of belief. On this record we are unable *565 to find that petitioner's contention is any less incredible than the contention advanced by respondent. We have set forth in considerable detail the testimony of petitioner, his mother, and his stepmother. The parties obviously believe, and we agree, that these three individuals are the key witnesses in this case. In many respects their testimony is not in conflict. For instance, from their combined testimony there is no doubt about the following facts: (1) in 1955 petitioner's father abandoned his mother in California shortly before petitioner was born; (2) the abandonment was due, at least in part, to the father's conviction and incarceration in Missouri for armed robbery; (3) about 11 or 12 years later petitioner and his mother moved to Russell, Kansas; (4) in 1972 when petitioner was about 17 years old his mother and her brother arranged a meeting between petitioner and his father, who was then living about 150 miles away in Liberal, Kansas; (5) in the interim, petitioner's father had not only successfully completed his prison sentence after it had apparently been reduced for good behavior, but had also succeeded in establishing a new life including among other things a devoted *566 wife and three children, a good job, a nice home, and at least two cars; (6) at their first meeting petitioner's father, with the knowledge of his mother and stepmother, gave petitioner a Lord Elgin watch and invited him to visit with the father and his second family in Liberal; (7) during the balance of 1972 and up to his graduation from high school in May of 1973 petitioner frequently visited with his father and his second family in Liberal; (8) upon his graduation from high school petitioner was given $ 400 in cash by his father with the knowledge of his mother and stepmother; (9) after his graduation from high school petitioner lived on a friendly and cordial basis with his father and stepmother for a few months; (10) petitioner then moved out to a garage apartment in Liberal but continued to visit back and forth with the father and his family until about July of 1974 when petitioner moved to Denver to live with his mother and stepfather; (11) petitioner was visited by his father in Denver in 1976; (12) in 1977 petitioner was visited in Colorado Springs by his father, stepbrother, and a friend of his stepbrother; (13) in January of 1983 petitioner's father was killed in an accident; *567 and (14) petitioner received no part of his father's estate or life insurance. From the record as a whole we are also satisfied and so find (1) that while Tommy Lee Brown had made a serious mistake in 1955, by 1972 he had become a good, kind, and generous man who was a devoted husband and father; (2) that he was extremely pleased with the opportunity to finally know and associate with his oldest son and was remorseful over his abandonment and failure to support the son during his early life; (3) that, as stated by Mary B. Brown, by 1974 Tommy Lee Brown was the type of person that if petitioner had told him he wanted to go to college, Mr. Brown would have "seen to it that he went"; (4) that during 1974, 1975, 1976, and 1977 Tommy Lee Brown was mentally and emotionally capable of making the gifts that petitioner said he made, provided he had access to the necessary funds; (5) that by the time he graduated from high school petitioner had developed such work habits and was so inherently frugal that he was capable of accumulating cash from his earnings during the years 1974 through 1981, especially in view of petitioner's propensity to avail himself during this period of free food, shelter, *568 or clothing from his mother and stepfather or at any given moment from at least one of his employers; and (6) that petitioner's work habits, frugality, and reclusive personality rendered him capable of hoarding $ 47,000 in cash from the excess of his earnings over his nominal living expenses during such years. Finally, from the record as a whole and from our close observation of petitioner during the trial, we are satisfied and ultimately find that he was a credible and truthful witness and that the source of the disputed deposits made to his checking account during 1982, 1983, and 1984 was a cash hoard which he had on hand at the beginning of 1982 and which he had accumulated from earnings and from gifts by his father. In so finding, we have considered all of respondent's arguments but we cannot conclude, as urged by respondent, that during 1982, 1983, and 1984 an individual with the personal history, frugal habits, and reclusive personality of petitioner could (1) regularly work and correctly report the income from two full time jobs, (2) earn legally or illegally and fail to report additional incomes of $ 16,231.80 in 1982 at age 27, $ 27,489.31 in 1983 at age 28, and $ 37,640.69 *569 in 1984 at age 29, and (3) earn such additional incomes without leaving any evidence of their source. We conclude, therefore, and find as an ultimate fact that petitioner did not have unreported income in 1982, 1983, and 1984 in the amounts determined by respondent. Our conclusion with respect to this question disposes of the other issues but due to concessions, Decision will be entered under Rule 155. Footnotes
*. In their stipulation the parties incorrectly used a different figure but $ 27,489.31 is obviously the correct figure from the record as a whole.↩
1. Unless otherwise indicated all section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue. * Respondent also determined that if the addition to tax under section 6653(b)(1) is sustained, the addition to tax under section 6653(b)(2) is also applicable.↩
*. At trial petitioner submitted a written estimate (Exhibit 9) which contained certain obvious errors in addition and multiplication. In the above tabulation, such errors have been corrected in order to arrive at his estimate that overall he accumulated about $ 47,000.↩
2. The record is unclear as to whether petitioner received free uniforms while working for APS and World Airways but the record as a whole tends to support an inference that such uniforms were provided by these employers.↩